UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

UNITED STATES OF AMERICA

22 Cr. 150 (JPC)

-against-

MANUEL PERALTA,

Defendant.

------------------------------------------------------------------------ x


**SENTENCING MEMORANDUM
FOR DEFENDANT
MANUEL PERALTA**


MICHAEL HUESTON, ESQ.
*Attorney for Defendant Manuel Peralta*
16 Court Street, 35th Floor
Brooklyn, New York 11241
(718) 246-2900


Dated:        Brooklyn, New York
              May 17, 2023

A.      **Introduction**

Defendant Manuel Peralta addresses the following issues related to his appropriate sentence.

Since his arrest, Mr. Peralta has lived daily with immense regret about what he did.  He chose to commit this offense and accepts responsibility for the harm he caused.  In this memorandum, we hope to show the Court that Mr. Peralta's youth, immaturity, and misguided values led him to "the streets," drug abuse, and his eventual participation in this crime.  In doing so, we will point out aspects of Mr. Peralta's difficult upbringing (comprised of a deported father, a mother who struggled to raise her children while homeless, and an abusive and corrupting stepfather) that put him on this trajectory.  We will also point out that, aside from two relatively minor incidents as a teenager and a traffic violation, Mr. Peralta is a first-time offender, not a hardened criminal or recidivist.

Mr. Peralta is motivated to succeed and put his criminal past behind him.  After his arrest, he acknowledged his failings and wanted his case resolved.  While at times he struggled with marijuana use, he was otherwise compliant with his conditions of pretrial release.  He was gainfully employed as a home healthcare aide with Port Morris Home Care Agency.  In this capacity, he cared for his grandmother who suffers from cardiac issues, working five days a week with her.  He provided financial support and childcare for his daughter.  And he attended multiple weekly group sessions and individual sessions at Odyssey House in the Bronx, where he received mental health and drug and alcohol treatment.

We will address this combination of factors, in addition to Mr. Peralta's sincere remorse, the difficulties people in jail face because of the pandemic, and legal arguments

regarding the heavy-handedness of the Guidelines.  We hope this discussion will demonstrate that the Court does not need to impose a further jail sentence to deter Mr. Peralta or send a message to society, given his characteristics, and that, in this instance, his sentence should focus on mental health treatment, education, and vocational training while under supervision.

**B.      Mr. Peralta's Background and Characteristics**

Information relating to Mr. Peralta's background and characteristics is discussed in the Presentence Report, his letters of support, and his letter to the Court.[1]  The following draws from those materials and other items as noted.

Manuel Peralta is a 21-year-old native New Yorker who has lived his whole life in the Bronx.  He is Hispanic.  He and his girlfriend have a 3-year-old daughter.

When Manuel was a boy, his father was deported to the Dominican Republic. During Manuel's childhood, his mother struggled to care for their family.  They experienced homelessness and lived in shelters as well as with Manuel's maternal grandmother.  Only when Manuel was 12 years old was his mother able to finally secure an apartment in a Housing Project in the South Bronx.

While Manuel was still a child, his mother became romantically involved with Manuel's stepfather.  Unfortunately, Manuel's stepfather was physically abusive to Manuel's mother, and Manuel witnessed him beat her.  Manuel tried to defend his mother from his stepfather's attacks.  Manuel's stepfather also introduced Manuel to smoking marijuana and gang culture.  Only police intervention removed this caustic person from direct involvement in Manuel's life.

---

[1] *See* Exhibits A and B.

As a child, Manuel was diagnosed with Attention Deficit Hyper-Activity Disorder.  He received treatment for the disorder and anger management for his temper, which he attributes, in part, to his father's absence.  With so much instability, Manuel struggled in school, dropping out of the Academy for Scholarship and Entrepreneurship in the Bronx in the ninth grade.  During this time, to escape his painful circumstance, Manuel began smoking marijuana daily.  This habit would continue until his arrest, including his taking oxycodone, Ecstasy and Percocets.  Notably, from November 2022 until January 2023, he was enrolled in outpatient mental health and substance abuse treatment at the Odyssey House in the Bronx.  He was diagnosed with Cannabis Abuse Disorder and Persistent Depressive Disorder.  He attended group and individual sessions.

While we are in no way downplaying the dangerousness of fentanyl, Manuel's past criminal conduct is essentially non-violent.  Since his arrest, Manuel has begun building his life.  Before this case, Manuel had only worked in a summer youth program cleaning Saint Ann's Park in the Bronx and briefly at Fresh Direct.  But after his arrest, he worked as a home aide through Port Morris Home Care Agency LLC from July 2022 until his remand in January 2023, where he cared for his maternal grandmother.

Manuel's personal story exemplifies the struggle young men like him often face. Through the prism of his life, we see how abuse, neglect, poverty, and inadequate socioeconomic opportunities impact young men who become offenders.  Manuel grew up in an environment known to result in psychological trauma during childhood development, which manifests as hopelessness, depression, aggression, impulsivity, dependence on drugs to escape, and a reliance on the streets to counteract feelings of

despair and powerlessness.[2]  Through Manuel's life, we see how young men like him often buckle and break under the immense pressure of accepting that only they can improve their lives despite painful and unfair circumstances.

Manuel's decision to commit crimes reflects a bleak outlook that many in our society share, a cultural cognitive disorder amplified in media and politics that glamorizes consumption and hype while treading on empathy and simple hard work. This distorted view has many parents, but primary among them is the hopelessness that can consume a people who have come to believe that their lives and the lives of others have little or no value.  The lack of importance of life is, perhaps, endemic to our present culture.  One need only reflect to see it.  We regularly cost-out lives in governance and industry by allowing harmful products to be advertised and consumed, jobs to be lost to technological advancements regardless of the tattered communities left behind, environmental crises to mount as we fail to act on climate change, and our people to be fed flat-screen violence for entertainment.  What sets a young man like Manuel apart is that he must now face the consequence of his conduct.

But Manuel sees this as an opportunity for growth, and we can all learn from him. He is resilient and determined.  He has many positive qualities and deserves our support, and his sentence should focus on education, training, and providing him with substance abuse and mental health services, while under supervision.

The letters from Manuel's family and friends support this outcome.  His brother Jael Peralta writes about their childhood, with Manuel teaching him to play sports and

---

[2]*See* Department of Justice, Archives, *Defending Childhood*, https://www.justice.gov/archives/defendingchildhood.

cook.  Family friend, Hennessey Arias, writes about her observing Manuel – while on pretrial release – caring for his grandmother and daughter and the positive change in his attitude from enrolling in counseling and treatment.  Reverend Jose Clarevo writes to inform the Court that Manuel is a member of their church and had been part of a team involved in caring for the homeless and that he was "proud" of Manuel's contribution. Manuel's other brother writes, "I wish you were here so you can help me with my basketball moves because you and Daniel were nice in basketball." And Manuel's youngest brother has drawn a picture of himself and Manuel and writes, "I want my brother to come home."

Manuel's mother, Tamika Rodriguez, writes that Manuel is a good son and father and has grown from this experience, especially caring for his maternal grandmother. Ramona Marte, Manuel's paternal grandmother, notes how his father's deportation hurt Manuel, and she wants the Court to know that Manuel is willing to change for his daughter.  Manuel's friend, Zacary Benoit, wants the Court to know that Manuel has been there for him when "times are tough."  Friend, Yashira Reyes, writes about Manuel's sense of humor and how she misses "joking around" with him.

Margaret Reyes, who dates Manuel's brother Daniel, describes Manuel as a "funny, loving and caring soul."  She also informs the Court, "Although [Manuel] made poor choices he was starting to change his life around while he was out here because he wanted a better future for himself and his daughter.  He was working a job and going to a program to help him be a better person.  He really wanted to get his GED to be able to find a decent job, he will continue all this if you decide to give him a second chance."

Margaret's brother, Scottie Reyes, informs the Court that Manuel "gave me advice about finishing school so I could go far in the future."  And their sister, Amy Reyes, writes, "He has a beautiful daughter who I had the pleasure to meet and she is just like him so loving. He makes sure she is good at all times as well as his family who dearly love and miss him."

While Manuel writes:

Your Honor,

I want to tell you what led me here.

I was in school until the 9th grade.  But I dropped out because I put myself in "the streets."  Due to me being "the streets," I started experiencing the things happening around me and making the wrong choices.  Then I found out I was going to be a father, and I started looking for a job to support my daughter, but I had no patience, so I decided to get into "the drug game."

But I've been fortunate since being incarcerated.  My cellmate has helped me a lot.  He showed me that although I thought I wasn't forcing people to use drugs, the ripple effect behind my selling drugs was far-reaching.  Besides hurting people who take them, the drugs I was selling took food out of children's mouths and could cause people to hurt others to get more drugs.

It got me thinking, really, for the first time.  What if my mom was hurt?  Or my grandma?  Or my daughter?  Or strangers?

I don't want to be the cause of anybody getting hurt.

Your Honor, actions speak louder than words, so I know that promises can be empty, but I know this is not the life I want.  Since this case, I've been working on myself to make better choices.  I'm working on my values because they were off.  I didn't value work.  I didn't appreciate learning a trade.  I didn't appreciate my freedom.  I didn't value my family.  I didn't respect other people who were struggling just like me.

I'm also working on my principles – what I want to guide me in life.  That means rejecting "the life of the streets," which is just about this false belief that you have to do what you have to do to survive.  That kind of thinking doesn't help anybody.  No trust.  No love.  No learning.  No courage.  It just makes everybody everyone else's enemy.  And that's no way to live.

I'm also working on my discipline.  My cellmate got me to pick up the Bible, and I'm reading it and learning and experiencing faith.  It calms me.  I'm letting the Lord be my foundation, which means I am learning from the Bible about how we are all God's children and should not hurt or take advantage of other people.

Your Honor, looking back, I see that I did not value myself, which in turn kept me from seeing the value of others.

I think this is a really important lesson to come to understand.

Your Honor, in the future, I plan to get my GED and take parenting classes.  And I'm asking to be released as soon as possible to help my daughter and grandma.  Also, I plan to get my commercial driver's license once released.  Driving a truck would be a good job to start with.  I started working as a home aide taking care of my grandma while on pretrial release, and that helped me learn about working, but I need to learn more.

Your Honor, I don't know how my life will turn out, but I'm hoping to start my own business, raise my daughter and be there for the people who love and help me, nothing complicated, just real every day.  That way, I can be the opposite of "the streets" and have a life – not a street lifestyle – and live something real.

Thank you for taking the time to read my letter.

## C.      Charges and Plea, Offense Conduct and Acceptance of Responsibility

Mr. Peralta is a non-violent offender who accepts responsibility for his conduct.

He was not a leader or organizer in the offense.

On January 20, 2023, Mr. Peralta pled guilty, with a plea agreement, to the lesser-

included offense as charged in Count One, charging that from November 2020 through

March 2022, in the Southern District of New York and elsewhere, he and others, conspired to distribute and possess with intent to distribute and possess a substance containing a detectable amount of fentanyl in violation of 21 U.S.C. § 841(b)(1)(C).

Mr. Peralta's conviction carries a maximum of 20 years, 21 U.S.C. § 841(b)(1)(C), and a term of supervised release of not less than three years, 21 U.S.C. § 841(b)(1)(C).

The parties and the Department of Probation agree that Mr. Peralta's guideline range is 37 to 46 months based on the following: a criminal history category of I and a total offense level of 21, which is predicated on a base offense level of 24 per U.S.S.G. § 2D1.1(a)(5) and (c)(8), and a three-level reduction per U.S.S.G. § 3E1.1(a) and (b).  The Department of Probation recommends a sentence of 18 months.  We ask for a sentence of time served and three years supervised release.

On balance, Mr. Peralta acquitted himself admirably on pretrial supervision, working, and attending counseling.  We ask the Court to consider this mitigating factor regarding Mr. Peralta's 18 U.S.C. 3553(a) analysis.  *Cf. Pepper v. United States*, 562 U.S. 476, 492-93 (2011) (reasoning that "postsentencing conduct also sheds light on the likelihood that he will engage in future criminal conduct . . . [and] exemplary postsentencing conduct may be taken as the most accurate indicator of 'his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon his.'" (internal citation omitted); *United States v. Walker*, 252 F.Supp.3d 1269, 1294 (D. Utah 2017) ("Twenty years of prison sentences failed to accomplish the deterrence achieved by a self-motivated defendant and a tough, yet effective treatment program.").

**D.      Comments and Objections to the Presentence Report**

By letter, we commented on the Presentence Report to correct that Mr. Peralta was under pretrial supervision from *May 10, 2022 until January 20, 2023* – not from March 24, 2022 until January 20, 2023.

We ask that the report be updated to correct this error.

**E.      18 U.S.C. § 3553(a)**

We respectfully request that the Court impose a non-guideline sentence of time served and three years of supervised release.  This total sentence would be sufficient, but not greater than necessary, to satisfy the requirements of 18 U.S.C. § 3553(a), considering Mr. Peralta's history and characteristics, the nature of the offense, the need to provide educational or vocational training, the need for general and specific deterrence, and the need to avoid sentencing disparities.

This Court is not required to impose a sentence based on the Guidelines or any Sentencing Commission policy that circumvents Congress' specific intent for individualized sentencing.  *Pepper v. United States*, 562 U.S. 476, 501 (2011).  Further, an individual assessment that considers Mr. Peralta's character and background supports a non-guideline sentence as "sufficient, but not greater than necessary" to achieve the sentencing objectives in this case.  *See* 18 U.S.C. § 3553(a)(1).

The Guidelines fail to include critical factors about Mr. Peralta's background, which Congress mandated must be included in arriving at the sentence to be imposed. *See* 18 U.S.C. § 3553.  When offenders' backgrounds and characteristics are ignored, marginalized, or reduced to second-class status, the goal of informative, individualized sentencing cannot be achieved.  Rather, offenders are left to the mercy of mathematical numbers that arrive at terms of incarceration with no empirical relationship to either

punishment or the causes that brought them before the court.  *See generally United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (court commenting on "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); Anthony M. Kennedy, *Speech at A.B.A. Annual Meeting* (Aug. 9, 2003) (criticizing the Guidelines as "too severe" and called for a general, across-the-board reduction in guidelines sentences).[3]  But in asking for a variance for Mr. Peralta, it is worth deconstructing the Sentencing Commission's position regarding its mission, as we believe it shows why the Guidelines are often so flawed and heavy-handed.

The Sentencing Reform Act ("SRA"), enacted in 1984, created the Sentencing Commission and instructed it to promulgate Guidelines that would reconcile the multiple purposes of punishment while promoting the goals of uniformity and proportionality.  *See* 28 U.S.C. §§ 991(b)(1)(A) and 991(b)(1)(B).  That sounds reasonable.  And under the SRA, the Commission was directed that it should "develop a sentencing range that is consistent with the purposes of sentencing described in section 3553(a)(2) of Title 18, United States Code," 28 U.S.C. § 994(m), and "establish sentencing policies and practices" that reflect "advancement in knowledge of human behavior as it relates to the criminal justice process."  28 U.S.C. § 991(b)(1)(C).  That also sounds reasonable.

However, absent in the Commission's mission was 18 U.S.C. § 3553(a)(1)'s mandate, which states that "in determining the particular sentence to be imposed, [the court] shall consider— (1) the nature and circumstances of the offense and the history

---

[3]*See* https://www.supremecourt.gov/publicinfo/speeches/sp_08-09-03.html.

and characteristics of the defendant[.]" Compare 18 U.S.C. § 3553(a) to 28 U.S. Code §§ 991 (United States Sentencing Commission; establishment and purposes) and 994 (Duties of the Commission).

As stated in 28 U.S.C. §§ 991 and 994, the Commission's purposes and duties are to support 18 U.S.C. § 3553(a)(2)'s goal: "the need for the sentence imposed…." *See* 28 U.S.C. §§ 991 and 994.  Neither code references 18 U.S.C. § 3553(a)(1), which undercuts the Commission's purported goal of the "advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U.S.C. § 991(b)(1)(C).  This omission, and strange oversight, is one of the reasons why the Guidelines are so skewed against defendants and why, we submit, courts are not required to impose a sentence based on them.  *Pepper v. United States*, 562 U.S. at 501.

Moreover, the Guideline's reliance on drug weight levels is a poor method of assigning culpability.  *See generally United States v. Diaz*, 2013 U.S. Dist. LEXIS 11386, at *2 (E.D.N.Y. Jan. 28, 2013) ("The flaw is simply stated: the Guidelines ranges for drug trafficking offenses are not based on empirical data, Commission expertise, or the actual culpability of defendants. If they were, they would be much less severe, and judges would respect them more. Instead, they are driven by drug type and quantity, which are poor proxies for culpability."); Anthony M. Kennedy, *Speech at A.B.A. Annual Meeting* (Aug. 9, 2003) (criticizing the Guidelines as "too severe" and called for a general, across-the-board reduction in guidelines sentences).[4]  The Sentencing Commission itself has recognized the "'harshness and inflexibility' of the drug trafficking guideline . . . as the most significant problem with the sentencing guidelines

---

[4] *See* https://www.supremecourt.gov/publicinfo/speeches/sp_08-09-03.html.

system." U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing* 55 (Nov. 2004).

This is why courts must be careful to guard against the "unintended anchoring effect that the [G]uidelines can exert" leading to "irrationally assign[ing] too much weight to the guidelines range[] just because it offers some initial numbers." *United States v. Ingram*, 721 F.3d at 40 n.2 (internal quotation marks and citations omitted); *see generally* Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" And "Blind Spot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw*, 104 J. Crim. L. & Criminology 489 (2014). That same caution applies here as Mr. Peralta's guideline level is being driven by drug type and quantity.

### 1. Lack of Guidance as a Youth and Similar Circumstances, Race and Socioeconomic Status

Mr. Peralta's life, like so many offenders, is one of diverted potential. While Manuel is not blameless, he is not responsible for the circumstances he was born and raised in. His life was beset with obstacles. He and his family were homeless. His father was deported. His stepfather was physically abusive to his mother, and involved him with gangs, which he thankfully rejected, but also drug use, which he continued. On "the streets" he associated with other lost young men like himself. And he grew up in poverty in the projects in the South Bronx.[5] And at this point in our history, it is a casual

---

[5] *See*, McCarthy, Colman *The Poorest District*, The Washington Post, Aug. 4, 1984, https://www.washingtonpost.com/archive/politics/1984/08/04/the-poorest-district/576b589a-f479-4293-a7e1-516bd558ff23/; Sisk, Richard, *South Bronx is poorest district in nation, U.S. Census Bureau finds: 38% live below poverty line*, Daily News Washington Bureau, Sept. 29, 2010, https://www.nydailynews.com/new-york/south-bronx-poorest-district-nation-u-s-census-bureau-finds-38-live-poverty-line-article-1.438344; NYU Furman Center, S*tate of the City, 2019, BX01: Mott Haven/Melrose BX01* ("The poverty rate in Mott Haven/Melrose was 39.6% in 2019 compared to 16.0% citywide."), https://furmancenter.org/neighborhoods/view/mott-haven-melrose, and *BX02: Morrisania/Crotona* ("The poverty rate in Morrisania/Crotona was 40.3% in 2019 compared to 16.0%

observation to say that projects further degrade the lives of their residents.  Over 60 years

ago, journalist and urban theorist Jane Jacobs commented presciently about these towers:

> There is a wistful myth that if only we had enough money
> to spend – the figure is usually put at a hundred billion
> dollars – we could wipe out all our slums in ten years…[.].
> But look what we have built with the first several billions:
> Low-income projects that become worse centers of
> delinquency, vandalism and general social hopelessness
> than the slums they were supposed to replace.[6]

Walk around a project complex, and you cannot help but see that we failed their

inhabitants by piling them in gaunt towers, isolated from the street in super blocks devoid

of commercial life.  They are buildings whose bleakness is absolute.  They are structures

of monotonous severity that share no bond with their inhabitants.  Such segregationist

design must matter in sentencing because the practice – which weaponizes space –

creates zones for the unequal application of law and policy and the systemic abuse and

neglect of targeted groups.  The stigma of confinement is debilitating.  And it is why

Justice Henry Billings Brown argued so perniciously in its defense:

> We consider the underlying fallacy of the plaintiff's
> argument to consist in the assumption that the enforced
> separation of the two races stamps the colored race with a
> badge of inferiority.  If this be so, it is not by reason of
> anything found in the act, but solely because the colored
> race chooses to put that construction upon it.

*Plessy v. Ferguson*, 163 U.S. 537, 551 (1896).  But, of course, that is segregation's aim:

to enforce a mindset of inferiority, as policy, against its targets.  *See Brown v. Board of*

---

citywide."), https://furmancenter.org/neighborhoods/view/morrisania-crotona; Eide, Stephen, *Poverty and Progress in New York I: Conditions in New York City's Poorest Neighborhoods*, Manhattan Institute, June 4, 2014, ("The neighborhoods examined in this report are: Mott Haven and Hunts Point in the South Bronx (Bronx Community Districts 1 and 2), https://www.manhattan-institute.org/html/poverty-and-progress-new-york-i-conditions-new-york-citys-poorest-neighborhoods-5869.html.

[6] *See* Jacobs, Jane, *The Death and Life of Great American Cities*, at 4.

*Education,* 347 U.S. 483, 494 (1954) ("To separate [children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.").  It is why so many young men, like Manuel, have difficulty breaking the mindset of inferiority to see beyond "the street."

Nevertheless, the Guidelines dogmatically assert that race, national origin, and socioeconomic status "are not relevant in the determination of a sentence."  *See* U.S.S.G. § 5H1.10.  But by ignoring these facts, the Guidelines participate in the phenomenon of collective amnesia about race and space in America that historian and academic, Richard Rothstein, wrote about in his book *The Color of Law: A Forgotten History of How Our Government Segregated America,*

> Half a century ago, the truth of *de jure* segregation was well known, but since then we have suppressed our historical memory and soothed ourselves into believing that it all happened by accident or by misguided private prejudice.  Popularized by Supreme Court majorities from the 1970s to the present, the *de facto* segregation myth has now been adopted by conventional, liberal and conservative alike.[7]

However, the irony is that by ignoring this critical part of the American character, the Guidelines, in fact, call their self-lauded empiricism into question.   Accordingly, these are important factors we respectfully ask the Court to consider in applying a variance for Mr. Peralta.  *See discussion United States v. Bannister*, 786 F. Supp. 2d 617, 688-89 (E.D.N.Y. 2011) ("Had the defendants been raised by cohesive, adequate families, most of the difficulties they encountered would probably never have come to pass.  Well-

---

[7] *See,* Rothstein, Richard, *The Color of Law: A Forgotten History of How Our Government Segregated America*, at xii.

resourced, attentive parents would have had the knowledge, ability, and insight to protect their children from many of the difficulties that befell these defendants in their youth, to obtain assistance to deal with their psychological and physical problems, and to obtain crucial opportunities for education, work, and personal growth.  Even those with learning disabilities would likely have been provided available resources to overcome their impairments at public expense.  That the defendants were born into circumstances without such support is at the center of this tragedy.").

Post *Booker*, we can continue to acknowledge that safe environments, resources, and expertise add to a child's prosperity and potential, but a child lacking the same can be subverted and diverted from who they can become.  This common sense is at the core of individualized sentencing.  And this is perhaps the Guidelines' most significant flaw – its dogmatic disavowal of reality, embedded in U.S.S.G. § 5H1.12, which states, "Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted."  And this begs the existential question: How much trust should we put in a sentencing scheme that ignores reality?

2. **Physical Condition, Including Drug or Alcohol Dependence or Abuse; Work History; Collateral Consequences; Family Circumstances; and Acceptance of Responsibility and Deterrence**

Mr. Peralta started abusing drugs as a boy.  He has benefited from drug treatment while on pretrial release and wants further treatment.  While drug or alcohol dependence or abuse is not necessarily relevant under the Guidelines, *see* Guideline § 5H1.4, an effort to end drug or alcohol dependence through rehabilitation may be.  *United States v. Maier*, 975 F.2d 944, 948 (2d Cir. 1992) (the Second Circuit held that the awareness of one's

drug dependence "and the demonstrated willingness to act to achieve rehabilitation, thereby benefiting the individual and society," is a reason for an adjustment). Accordingly, we respectfully ask the Court to consider this as a mitigating sentencing factor and, if the Court imposes further imprisonment, recommend to the Bureau of Prisons that Mr. Peralta receive drug treatment while incarcerated.

Mr. Peralta worked in a summer youth program cleaning Saint Ann's Park in the Bronx, at Fresh Direct, and after his arrest, as his grandmother's home aide through the Port Morris Home Care Agency LLC.  While an offender's employment record, under the Guidelines, is discouraged as a factor, *see United States v. Jagmohan*, 909 F.2d 61, 65 (2d Cir. 1990), it is a valid consideration as a variance, as it demonstrates his striving to better his life.  Moreover, you cannot overstate the need for work in a person's life.  We are all, in large part, the work we do.  Indeed in 1968, Dr. Martin Luther King, Jr. fought to build the Poor People's Campaign, making explicit his commitment to improving the conditions of the working poor by going to Memphis, declaring that "all labor has dignity."[8]  So focusing Mr. Peralta's sentence on work, education, and vocational training will be helpful to him and society, and this is also a mitigating factor.

Further, we hold no illusion of how difficult it will be for Mr. Peralta to rebuild his life once released.  He will suffer the collateral consequences of being a convicted felon, which can dramatically impact one's ability to find a good job and support a family.  So, we respectfully ask the Court to consider this mitigating factor, consistent with § 3553(a)'s directive.  *See United States v. Stewart*, 590 F.3d 93, 141 (2009) ("It is

---

[8] *See* Fassler, Joe, *'All Labor Has Dignity': Martin Luther King, Jr.'s Fight For Economic Justice*, The Atlantic, Feb. 22, 2011, https://www.theatlantic.com/entertainment/archive/2011/02/all-labor-has-dignity-martin-luther-king-jrs-fight-for-economic-justice/71423/.

difficult to see how a court can properly calibrate a 'just punishment' if it does not

consider the collateral effects of a particular sentence.").

We also ask the Court to factor in the impact Mr. Peralta's further incarceration

will have on his young daughter. *See, e.g.*, *United States v. Galante*, 111 F.3d 1029,

1035 (2d Cir. 1997) ("the families of defendants are the intended beneficiaries of

downward departure on the grounds of extraordinary circumstances relating to family

responsibilities"); *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (the

potential for imprisonment to effect the destruction of an otherwise strong family unit can

be a basis for a judge's discretionary departure from the Guidelines range); and *United*

*States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (same). All children need involved

and loving parents. And as Mr. Peralta's absent father negatively impacted him, his

absence is adversely affecting his daughter.

Mr. Peralta's letter demonstrates that his growth and sincere contrition also

support a downward variance. *See United States v. Reyes*, 9 F.3d 275, 280 (2d Cir. 1993)

(In determining whether the defendant has accepted responsibility for the full scope of

the offense, the district court has the discretion to weigh a defendant's candor and

remorse) (citing *United States v. Cousineau*, 929 F.2d 64, 69 (2d Cir. 1991) (denial of §

3E1.1 reduction proper where district court determined defendant "had not shown

remorse or acknowledged the wrongfulness of the conduct for which she was

convicted"). Indeed, the likelihood that a defendant will commit further offenses is an

issue the Sentencing Commission views as important.

Finally, this discussion of Mr. Peralta's background and characteristics is not an

excuse for his conduct. However, it illustrates how we, too often, hold the most

vulnerable in our society, the most accountable, and it is properly offered as a basis for a variance.  As Supreme Court case law and statutory authorities clarify, mitigation evidence is not permitted or presented as an excuse or justification for engaging in criminal conduct but rather for mitigating the length of a sentence or type of punishment to be imposed.  *See Lockett v. Ohio*, 438 U. S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *see also*, 18 U.S.C. § 3661 and 21 U.S.C. § 850.  As Justice O'Connor noted in her concurring opinion in *California v. Brown*, 479 U.S. 538 (1987), evidence about offenders' backgrounds and character is relevant because of the belief, held by this society, that people who commit criminal acts that are attributable to disadvantaged backgrounds, or emotional and mental problems, may be less culpable for sentencing purposes than those who have not had such experiences.  *Id*. at 545.

### 3.    Lack of Earned Time Credits for Fentanyl Offenders

The First Step Act bars sentence reductions for participating in programs for offenders who commit fentanyl conspiracies.  *See* 18 U.S.C. § 3632(d)(4)(D)(lxvi).  Normally, a non-violent controlled substance offender like Mr. Peralta can expect a 10 to 15-day reduction for every 30 days of completed classes.  18 U.S.C. § 3632(d)(4)(A).  But if the Court imposes a further prison sentence, he will not have the same programming incentives as other similarly situated offenders.  This will undermine the educational and vocational goals we are asking to be provided to Mr. Peralta.  Accordingly, this is also a basis for a variance.

### 4.    Harsh Detention Conditions

We also ask the Court to vary Mr. Peralta's sentence because of the continued consequences of the COVID Pandemic.  Mr. Peralta will, like all prisoners, continue to

be impacted by the hardships of quarantines, lockdowns, and limited social visits because of the pandemic.[9]  We do not want to overstate the point.  Mr. Peralta is healthy.  But to prevent outbreaks, prisons lock down inmates in their cells for weeks at a time.  This warehousing leads to little to no rehabilitative and educational services being offered, which we believe is critical for Mr. Peralta's further development.  *Cf. United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 (2d. Cir. 1996); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004); *United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 181004, at *7, 8 (S.D.N.Y. Sep. 30, 2020) ("[T]he actual severity of [the defendant's] sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing."); *United States v. McRae*, 2021 U.S. Dist. LEXIS 8777, at *10 (S.D.N.Y. Jan. 15, 2021) ("Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring the just sentence.").

---

[9] FBOP, *COVID-19 Modified Operations Plan & Matrix*, *https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp*

**F.      Conclusion**

We respectfully urge the Court to impose a non-guideline sentence of time served,

then three years of supervised release.  This is a significant penalty that amply punishes

Mr. Peralta for his offense conduct, maintains and encourages respect for the

administration of justice, and serves as an individual and general deterrent.  It is a

sufficient, but not greater than necessary, sentence.  Mr. Peralta respectfully reserves the

right to raise additional issues, if necessary, during sentencing.

Dated:          Brooklyn, New York
                May 17, 2023


                                Respectfully submitted,

                                /s/_____

                                MICHAEL HUESTON, ESQ.
                                *Attorney for Defendant Manuel Peralta*
                                16 Court Street, 35th Floor
                                Brooklyn, New York 11241
                                (718) 246-2900